# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN F. HENRIQUES,<br><br>          Petitioner,<br><br>    v.<br><br>JAMES HARTLEY, Warden<br><br>          Respondent.<br>_____/ | 1:09-cv-02166-AWI-DLB (HC)<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>[Doc. 1] |

      Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented by Benjamin Ramos.

## BACKGROUND

      Petitioner is in the custody of the California Department of Corrections and Rehabilitation following his conviction in Orange County, for second degree murder. (Petition, at 5-6.) Petitioner is serving a sentence of fifteen years to life in prison. (Id. at 5.)

      In the instant petition, Petitioner does not challenge the validity of the state court conviction; rather, Petitioner challenges the Board of Parole Hearings' (hereinafter Board) June 10, 2008 decision finding him unsuitable for parole. Petitioner claims that his due process rights were violated because the Board's decision was not supported by some evidence and the Board has implemented a policy against granting parole in violation of his constitutional rights.

      On October 16, 2008, Petitioner filed a petition for writ of habeas corpus in the Orange County Superior Court . (Petition, Appendix 1.) On November 3, 2008, the superior court

denied the petition in a reasoned decision finding some evidence to support the Board's decision. (Id.)

On February 3, 2009, Petitioner filed a state petition for writ of habeas corpus in the California Court of Appeal, Second Appellate District. (Petition, Appendix 1.) On February 10, 2009, the petition was denied without prejudice to refiling in the Fourth District Court of Appeal. (Id.)

Petitioner then filed a state petition for writ of habeas corpus in the California Court of Appeal, Fourth Appellate District, which was summarily denied on March 12, 2009. (Petition, Appendix 3.)

Petitioner filed a petition for review in the California Supreme Court, which was summarily denied on May 13, 2009. (Petition, Appendix 4.)

On June 22, 2009, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. (Petition, Appendix 5.) The petition was denied on November 19, 2009, with citation to In re Miller, 17 Cal.2d 734 (1941). (Petition, Appendix 5.)

Petitioner filed the instant federal petition for writ of habeas corpus on December 14, 2009. Respondent filed an answer on February 16, 2010, and Petitioner filed a traverse on March 4, 2010. (Court Docs. 11, 12.)

STATEMENT OF FACTS[1]

> A decomposed body, wrapped in blankets, was found in a ravine on February 3, 1991. It took several months to identify the victim, Theresa Cacho. Within two weeks of the identification, however, [Petitioner], Cacho's live-in boyfriend, was arrested and charged with her murder.
>
> [Petitioner] admitted he killed Cacho, but insisted it was an accident. He testified they were arguing and twice when he tried to leave the house to avoid further unpleasantness, she shoved him into the couch. When she appeared ready to push him a third time, he pushed back. She stumbled, hit her head on the door, and lost consciousness.
>
> [Petitioner] attempted to revive her by splashing water on her face, but soon realized she was dead. He succumbed to panic and enlisted the aid of two friends to dispose of the body. Brian Davidson and Thomas Good testified they helped [Petitioner] take it to a hillside off the Ortega Highway.

---

[1] These facts are taken from the unpublished opinion of California Court of Appeal, Fifth Appellate District in Petitioner's direct appeal, dated April 18, 1995. (Petition, Exhibit A.)

Forensic evidence and other testimony strongly suggested the victim's death was not an accident, however. A prosecution expert testified the victim died from asphyxiation caused by strangulation and airway obstruction. A pair of socks and a plastic bag were in her mouth when the body was recovered. They were similar to socks and plastic bags found in [Petitioner's] apartment.

Davidson's testimony was particularly damning. He lived with [Petitioner] and Cacho at the time of the killing and left one afternoon during the Christmas season because they were arguing. When he returned, [Petitioner] hysterically claimed Cacho died accidentally. She was wet, gaged, and handcuffed. [Petitioner] removed the handcuffs before they put the body in the car.[2]

Davidson insisted he helped [Petitioner] "[b]ecause I feared . . . him at the same time I feared that he would catch up with me [and kill me]." A month before the killing, [Petitioner] told Davidson that Cacho "called his work and told somebody there, a manager or somebody, that he was selling drugs out of there and they put on an investigation and whatnot." Davidson added [Petitioner] wanted to "get rid of" the victim because she "was going to ruin his life."

Davidson was questioned exhaustively concerning a videotaped police interview he gave after Cacho's body was identified. He admitted he was not always truthful with the police and could no longer recall many of his statements.

Over a defense hearsay objection, the interrogating officer was recalled to the stand and read portions of the transcript of the interview. Davidson's statement in the interview that [Petitioner] harped for more than a month on his need to get rid of Cacho because he was afraid she would report his drug activities to the police was consistent with his trial testimony. But Davidson failed to state in the interview that [Petitioner] said he accidentally killed the victim.

Various prosecution witnesses testified concerning the relationship between [Petitioner] and Cacho. After several preliminary questions to the first of these witnesses, the judge said, "I am going to interrupt. With regard to drugs, ladies and gentlemen, as I said, drugs are a problem in our society, and the fact whether or not [Petitioner] did or did not deal in drugs and so forth is just for a limited purpose of possibly motive and so forth. No one's on trial for drugs here, so don't get carried away. . . .

. . . Ronald Carter, who rented a room in [Petitioner's] home between June and October 1990, testified he watched one evening shortly before he moved out as Cacho made a telephone call and reported that someone was dealing drugs at work and she would identify him for a certain sum of money. Several weeks later Carter saw [Petitioner] parked down the street from the house. [Petitioner] got out of his car as Carter approached and mentioned that someone at work received information that he was dealing drugs. When Carter told him Cacho was the one who made the call, [Petitioner] reacted with disbelief.

Davidson then testified to a conversation with [Petitioner] concerning the anonymous drug dealing telephone call. No one asked whether he had a similar

---

[2] There were no handcuffs on the body when it was discovered. Decomposition made it impossible to determine whether the victim was in fact handcuffed at the time of her death.
   [Petitioner] had no explanation for the gag. He denied using it or handcuffs on the victim.

3

1  conversation with Cacho. Three other prosecution witnesses (Christopher Barba, Frank John Rocha, and John Alvarado) testified in quick succession and reported Cacho told them the drug dealing story.

When [Petitioner] took the stand, his attorney stated, "We've entered a stipulation at least concerning one phone call. And correct me if I am wrong, Mr. Cafferty [the prosecutor]. My recollection was the month of July someone from Lucky's received the phone call concerning an employee that might have been selling drugs there, and the informant was willing for money to turn that person in. Were you aware of that?" [Petitioner] answered in the affirmative and explained he learned of the phone call several weeks later from a store manager and confronted the victim with the information that same evening. [Petitioner] confessed to being "really upset" and "really hurt." He overcame his "first instinct [] to break up with her [because] then I realized that I loved her so much and I didn't want her to leave me."

In support of [Petitioner's] testimony that the killing was accidental, one defense expert testified the victim could have choked on her own tongue after losing consciousness. Another defense expert did not believe the tube socks in the victim's mouth were similar to those found in [Petitioner's] apartment. Although the plastic baggie was like others found there, this expert believed the material was too common for the similarity to have any significance.

(ECF No. 1, Pet. Ex. A at 2-5.)

DISCUSSION

I.   Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v.

4

1  Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a
2  habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the
3  petition is not challenging [her] underlying state court conviction.'").

4        The instant petition is reviewed under the provisions of the Antiterrorism and Effective
5  Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63,
6  70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the
7  adjudication of the claim "resulted in a decision that was contrary to, or involved an
8  unreasonable application of, clearly established Federal law, as determined by the Supreme Court
9  of the United States" or "resulted in a decision that was based on an unreasonable determination
10 of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C.
11 § 2254(d); see Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

12       "[A] federal court may not issue the writ simply because the court concludes in its
13 independent judgment that the relevant state court decision applied clearly established federal
14 law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.
15 A federal habeas court making the "unreasonable application" inquiry should ask whether the
16 state court's application of clearly established federal law was "objectively unreasonable." Id. at
17 409.   Petitioner has the burden of establishing that the decision of the state court is contrary to
18 or involved an unreasonable application of United States Supreme Court precedent. Baylor v.
19 Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the
20 states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a
21 state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th
22 Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

23 II.    Review of Petition

24       There is no independent right to parole under the United States Constitution; rather, the
25 right exists and is created by the substantive state law which defines the parole scheme. Hayward
26 v. Marshall, 603 F.3d 546, 559, 561 (9th Cir. 2010) (en banc) (citing Bd. of Pardons v. Allen,
27 482 U.S. 369, 371 (1987); Pearson v. Muntz, 606 F.3d 606, 609(9th Cir. 2010) (citing Wilkinson
28 v. Austin, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005)); Cooke v. Solis, 606 F.3d

1206, 1213 (9th Cir. 2010). "[D]espite the necessarily subjective and predictive nature of the parole-release decision, state statutes may create liberty interests in parole release that are entitled to protection under the Due Process Clause." Bd. of Pardons v. Allen, 482 U.S. at 371.

In California, the Board of Parole Hearings' determination of whether an inmate is suitable for parole is controlled by the following regulations:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
>
> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

Cal. Code Regs. tit. 15, §§ 2402(a) and (b). Section 2402(c) sets forth circumstances tending to demonstrate unsuitability for release. "Circumstances tending to indicate unsuitability include:

> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
> > (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
> >
> > (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
> >
> > (C) The victim was abused, defiled or mutilated during or after the offense.
> >
> > (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
> >
> > (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
>
> (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>
> (3) Unstable Social History. The prisoner has a history of unstable or tumultuous

relationships with others.'

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

Cal. Code Regs. tit. 15, § 2402(c)(1)(A)-(E),(2)-(9).

Section 2402(d) sets forth the circumstances tending to show suitability which include:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Snydrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

Cal. Code Regs. tit. 15, § 2402(d)(1)-(9)

The California parole scheme entitles the prisoner to a parole hearing and various procedural guarantees and rights before, at, and after the hearing.  Cal. Penal Code § 3041.5.  If denied parole, the prisoner is entitled to subsequent hearings at intervals set by statute.  Id.  In addition, if the Board or Governor find the prisoner unsuitable for release, the prisoner is entitled to a written explanation. Cal. Penal Code §§ 3041.2, 3041.5.  The denial of parole must also be

7

supported by "some evidence," but review of the Board's or Governor's decision is extremely deferential. In re Rosenkrantz, 29 Cal.4th 616, 128 Cal.Rptr.3d 104, 59 P.3d 174, 210 (2002).

Because California's statutory parole scheme guarantees that prisoners will not be denied parole absent some evidence of present dangerousness, the Ninth Circuit Court of Appeals recently held California law creates a liberty interest in parole that may be enforced under the Due Process Clause. Hayward v. Marshall, 602 F.3d at 561-563; Pearson v. Muntz, 606 F.3d at 609. Therefore, under 28 U.S.C. § 2254, this Court's ultimate determination is whether the state court's application of the some evidence rule was unreasonable or was based on an unreasonable determination of the facts in light of the evidence. Hayward v. Marshall. 603 F.3d at 563; Pearson v. Muntz, 606 F.3d at 608.

The applicable California standard "is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." In re Lawrence, 44 Cal.4th 1181, 1212 (2008) (emphasis in original and citations omitted). As to the circumstances of the commitment offense, the Lawrence Court concluded that

> although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

Id. at 1214.

In addition, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prison remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." In re Lawrence, 44 Cal.4th at 1212.

"In sum, a reviewing court must consider 'whether the identified facts are *probative* to the

central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor.'" Cooke v. Solis, 606 F.3d at 1214 (emphasis in original) (citing Hayward v. Marshall, 603 F.3d at 560).

At Petitioner's second parole hearing[3] in 2008, the Board found Petitioner unsuitable for release based on the circumstances of the commitment offense, lack of insight into the causative factors, lack of meaningful remorse for the consequences of his actions, and unfavorable psychological report.  These findings provide some evidence to support the Board's finding of unsuitability, and the superior's court decision was not unreasonable.

With regard to the commitment offense, the Board found that it was carried out in an especially cruel and callous manner.  Although Petitioner claimed the killing was an accident, the evidence in the record belies his claim.  Petitioner murdered the victim in a cruel and callous manner by cutting off her air supply with a pair of rolled up socks in a plastic bag stuffed inside her mouth.  The victim was particularly vulnerable as she was Petitioner's girlfriend and although there was evidence she feared him, she apparently had no suspicion that he would murder her.  Petitioner continues to claim the killing was an accident; yet, Petitioner did not render any aid to the victim or seek medical assistance.  Rather, he solicited the aid of two friends to dispose of the body and the body was ultimately dumped into an ravine where it would be difficult to locate.  Such evidence is not consistent with an accidental killing.

Petitioner continued to make inconsistent statements regarding the offense, including that the victim fell and hit her head on a door, and another statement that she hit her head on a doorframe.  The Board found that Petitioner lacked a true understanding of the nature of the crime and his present mental state was one of denial.  The most recent psychological report supports such finding.  Dr. Carrera made the initial observation that Petitioner "is considered to be an unreliable historian, as a review of collateral data revealed he has provided inconsistent information about a variety of topics.  For example, previous psychological reports documented that [Petitioner] has provided vastly differing accounts of his substance use history and the life

---

[3] Petitioner appeared at his initial parole consideration hearing on December 23, 2003, and a subsequent parole hearing was denied for four years.

9

1  crime.  Additionally, manipulative behavior has also been indicated.  The BPH transcripts record
2  concerning regarding [Petitioner] having typed his own laudatory chronos and state, 'It's
3  completely inappropriate and what it does is taint everything.  It makes us wonder what is real in
4  there.  When you admit to creating them it tends to really erode your credibility.'" (Exhibit H, to
5  Petition.)

6       Dr. Carrera found that Petitioner "continues to have very little insight into his past
7  behavior and does not take full responsibility for the crime nor does he show any remorse or
8  empathy for the victim or her parents. [Petitioner] did not divulge his full involvement in the
9  murder of his girlfriend during the evaluation interview and told a version of the crime which
10 differed in important aspects from those revealed in the official version, including that he stated
11 to this evaluator that Theresa died of head wounds.  The coroner's report reveals that she died
12 from asphyxiation."  (Id.)  Petitioner was unable to articulate what triggered his anger and violent
13 actions on the day of the commitment offense and was completely unresponsive in this respect.
14 (Id.)

15       Dr. Carrera also found that Petitioner displayed very little remorse or empathy for the
16 victim or her parents.  He never expressed "a desire to apologize or ask for forgiveness and did
17 not express empathy for Theresa's parents loss nor signs of remorse during this discussion or
18 elsewhere during the evaluation interview."  (Id.)  Petitioner's overall score for future risk of
19 violence is in the moderate range, which was elevated in relation to his lack of insight and
20 negative attitudes.

21       Petitioner opposes Dr. Carrera's evaluation and points to Dr. Macomer's criticism of her
22 report.  Petitioner argues that the Board summarily rejected Dr. Macomer's report and failed to
23 afford it proper weight.  Petitioner presented Dr. Macomer's report to the Board and argued that
24 Dr. Carrera's report should be given less weight.  The Board obviously did not agree with
25 Petitioner and this Court cannot re-weigh such finding.

26       The Board also pointed out that Dr. Carrera could not determine the extent that substance
27 abuse may have played in the commitment offense.  The Board was troubled by the fact that
28 Petitioner denied being involved in drug dealing.  Yet, Petitioner admitted to using substances in

1  the past, including alcohol and marijuana and stated he "got caught up with the drug crowd" and
2  there was evidence in the file indicating he was a drug dealer.[4]  (Id.)  Petitioner argues that he did
3  not categorically deny dealing drugs, but rather denied dealing drugs from his home or place of
4  employment, and points out that he admitted dealing drugs at the initial parole hearing in 2003.
5  Petitioner's argument is pointless and nonsensical.  It is clear the Board was inquiring into
6  Petitioner's prior drug dealing, and it is clear Petitioner was not being fully forthcoming with the
7  Board.  The determination of his prior drug dealing activity is certainly relevant to the Board's
8  determination of whether he is suitable for release, and Petitioner cannot now benefit by playing
9  word-games.  Therefore, Petitioner's argument is not well-taken.  In any event, even if this
10 finding is found to be unsupported by the record, there is other independent evidence in the
11 record that clearly supports the Board's finding of unsuitability.

12       Pursuant to section 2402(d)(1)-(9), the Board also considered the factors in support of
13 suitability.  The Board commended Petitioner for his extensive participation in self-help
14 programming, being disciplinary free for the past seven years, and vocational training and
15 positive work assignments, including marketable skills.  However, on balance, the Board found
16 these positive aspects did not outweigh the factors in favor of unsuitability, and the Board denied
17 parole for three years and recommended that he remain disciplinary free, continue in self-help
18 programming, and cooperate with clinicians in the completion of a new psychological evaluation.

19       Petitioner contends that the Board's decision to deny parole was based on its anti-parole
20 policy.  Petitioner relies primarily on the Santa Clara County's Superior Court decision in In re
21 Criscione, No. 71614 (filed August 30, 2007).  In that case, the superior court found the Board's
22 decision to deny parole was not based on some evidence, but rather reflected the use of an anti-
23 parole policy in its application of section 2402(c).  Petitioner fails to point out that the California
24 Court of Appeal reversed the decision of the superior court, and found that some evidence
25 supported the Board's decision to deny parole without considering whether the Board unlawfully
26 applied section 2402(c).  Petitioner's other evidence also fails to demonstrate an anti-parole

---

[4] The Board stated there was testimony in the parole report that he was dealing in methamphetamine and marijuana which is contained in the state appellate court opinion, and was confirmed by his crime partner.

11

policy, or that any alleged policy was in fact applied to Petitioner in this case. Indeed, for the reasons explained above, the Board's decision was based on an individual review of the suitability and unsuitability factors set forth in section 2402, and there is no basis to Petitioner's claim of an anti-parole policy in this instance.

Based on the record before the Board at the 2008 hearing, there is some evidence to support the finding of unsuitability, and the superior court's determination was not an unreasonable application of the some evidence standard, nor an unreasonable application of the facts in light of the record. In sum, the cruel and callous nature of the commitment offense, lack of insight and remorse, and unfavorable psychological report provide some evidence that Petitioner remains an unreasonable risk to public safety if released. See e.g. In re Shaputis, 44 Cal.4th 1241, 1260 (2008) (the circumstances of the commitment offense coupled with a lack of insight and unfavorable psychological evaluations constituted some evidence of unsuitability for release on parole).

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED;

2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to

1 Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served
2 and filed within fourteen (14) days after service of the objections. The Court will then review the
3 Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that
4 failure to file objections within the specified time may waive the right to appeal the District
5 Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
6     IT IS SO ORDERED.
7     Dated: **July 22, 2010**      /s/ **Dennis L. Beck**
                                        UNITED STATES MAGISTRATE JUDGE